**UNITED STATES of America**

v.

**Michael D. ANDREAS, Mark E. Whitacre, Terrance S. Wilson, Kazutoshi Yamada.**

**No. 96 CR 762.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 17, 1998.

James T. Phalen, John M. Bray, Kevin M. Dinan, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, John David Shakow, King & Spalding, Washington, DC, for Michael D. Andreas.

Bill T. Walker, Granite City, IL, for Mark E. Whitacre.

Kristina M.L. Anderson, Fishman, Merrick, Miller, & Anderson, P.C., Chicago, IL, Robert W. Fleishman, Mark J. Hulkower, Reid H. Weingarten, Steptoe & Johnson, Washington, DC, for Terrance S. Wilson.

Philip A. Guentert, U.S. Attorney's Office, Chicago, IL, Jerry Michael Santangelo, Neal, Gerber & Eisenberg, Chicago, IL, for U.S.

## MEMORANDUM OPINION AND ORDER

MANNING, District Judge.

Defendants Michael D. Andreas, Mark E. Whitacre, and Terrance S. Wilson now move for an immediate mistrial, asserting that the prosecution violated their respective Fifth Amendment privilege against self-incrimination by engaging in prosecutorial misconduct during closing argument. First, they argue that the prosecutor improperly commented on the defendants' failure to testify in order to suggest the inference that the defendants are liars and therefore, guilty of the charged offense.

Next, the defendants assert that the remarks were exacerbated by the government's immediate launching into an unwarranted attack on the integrity of defense counsel by implying that they would "construct" defenses because, unlike the defendants, defense counsel had the opportunity to review the evidence, and therefore, can make their argument conform to the evidence. In short, the defendants claim that the prosecutor implied that defense counsel would lie in order to convince the jury to acquit their clients.

Finally, the defendants contend that the prosecution improperly vouched for its witnesses and the strength of its case overall by comparing it to other cases prosecuted and proclaiming the evidence of guilt in this case as "the most compelling and powerful that has ever been presented in an American courtroom." Tr. 5605.

The prosecution urges the court to deny the motion, arguing: (1) the defendants did not contemporaneously object to the comments and therefore waived any claims for mistrial stemming from his closing argument; (2) that the statements, when construed in the context of the entire record, were proper and are not grounds for a mistrial; (3) any potential prejudicial effect of the comments was cured by the court's curative instruction.

## BACKGROUND

Defendants Michael D. Andreas, Mark E. Whitacre, and Terrance S. Wilson were indicted for allegedly violating the Sherman Antitrust Act, 15 U.S.C. § 1, by conspiring to fix the worldwide price and sales volume allocation of lysine (a chemical feed additive) while they were executives of the Archer Daniels Midland Company (ADM). The indictment was the result of a two and one-half year covert investigation headed by the FBI with the assistance of former mole, now defendant, Mark E. Whitacre. On June 29, 1995 the FBI raided ADM corporate headquarters, executing a search warrant for evidence related to the alleged price-fixing conspiracy. Contemporaneously with the raid, FBI agents interviewed defendants Andreas and Wilson. Both denied committing any crime, but then requested counsel and refused to answer further questions. They were subsequently indicted and after approximately two years of pretrial preparation, trial commenced on July 9, 1998.

The evidentiary phase of the trial lasted almost two months, concluding on September 2, 1998. On September 8, 1998, the court instructed the jury as to the applicable law, and the prosecution began its closing argument. The court's determination of this motion for mistrial requires close scrutiny of the trial record. The parties do not dispute that the statements must be construed in the context of the entire record. Ironically, the government saw fit not to include *any* cita-

tions to the trial transcript. The court sets forth in the following paragraphs the portions of the record which are germane to the issues at hand. At trial, the prosecution stated:

MR. LASSAR (for the government): There's one more event to talk about, and that event occurred on June 29th, 1995, when the investigation became public and the scheme ended. Remember search warrants were executed that day, and the FBI interviewed Mr. Wilson and Mr. Andreas. And independently Mr. Wilson and Mr. Andreas had the same response to being interviewed. They lied and lied and lied. They weren't going to tell the truth about what happened to the FBI. Instead they lied. . . .

When the defense attorneys address you, they're going to come up with all kinds of different defenses all over the place. But when you're hearing all those defenses, *ask yourselves why didn't we hear those defenses from Mr. Wilson and Mr. Andreas on June 27, 1995? That was their opportunity if they had a defense. They were confronted. That was their opportunity to give all these defenses. You're not going to hear those lies from the attorneys because the attorneys have an advantage over their clients. The attorneys have heard all the evidence the government has. They know before trial about all the tapes, and so they constructed new defenses for your benefit that they're going to argue to you, not the ones that their clients came up with, and that's evidence to you that the defenses you're going to hear are not true because if they were true, you would have heard them given to the FBI by Mr. Wilson and Mr. Andreas in June of 1995.*

Defense counsel objected and moved for a mistrial, stating for the record:

MR. WEINGARTEN (for Wilson): Your Honor, I make another motion for mistrial. Mr. Lassar's comments on the defendants' inability or decision to respond truthfully on June 27th, 1995 was an indirect but a very prejudicial way to comment on their failure to testify at this trial. Mr. Lassar knows full well that Terry Wilson was interviewed for a period of twelve minutes. He was asked a couple of questions, then asked for corporate counsel to be advised

of this interview, and the interview ceased. And for Mr. Lassar to comment that he [Wilson] had some obligation at that point to give his defense is really a very, very prejudicial, very improper and drew attention to Mr. Wilson's decision not to testify at this trial. And I therefore ask for a mistrial.

MR. BRAY (for Andreas): Your Honor, I agree, particularly putting it to defense counsel as the purported creator of all defenses I think really resounding the—draws the inference that the failure of the defendants to testify is a major silence here. I think to put that in the context in which he did, attributing everything comes here in the way of defense, to defense counsel is a very powerful and in my experience the most unusual and emphatic comment on the defendants' failure to testify I have ever heard, albeit indirect. . . .

MR. WALKER (for Whitacre): Your Honor, he's [Lassar] told basically the jury when I get up there and say anything I'm lying or made it up. And my client on June the 29th wasn't even interviewed because he was on the [government's] team. Everything was faked up or done for them and that's where I got the impression. And I looked at several of the jurors when he [Lassar] made that comment, and it got the attention of several of them. And I feel it's a statement, again, it's ringing a bell, and I can't unring that bell. It's already shadowed what I'm going to say, and my client doesn't fit in the situation these other two do in the sense the FBI came in, identified themselves and asked them questions, but they were all grouped in as defendants, and he [Lassar] didn't single them out, and it's very prejudicial, and I can't unring the bell. . . .

MR. LASSAR: It's entirely proper conduct. The defendants lied. I pointed that out. I said their attorneys are going to tell different stories. That's proper argument.

MR. WALKER: I'd ask the court to, Your Honor, don't take our interpretation. Just listen to the words he said. . . .

MR. WEINGARTEN: It's in evidence that Terry Wilson's interview took twelve

minutes and it ended when he sought counsel. The idea that he had an obligation at that point to put forward his defense and that anything I say in closing argument tomorrow is therefore a lie is truly outrageous.

THE COURT: Anything else Mr. Lassar?

MR. LASSAR: No, although I don't remember the twelve-minute thing. That's the first time—

MR. WEINGARTEN: Directly in the 302

THE COURT: That's not in evidence.

MR. WEINGARTEN: He acknowledged it pursuant to my cross examination that that was true, Agent Shepard.

THE COURT: I don't remember the twelve minute thing, but I am concerned about what you said, Mr. Lassar.

MR. LASSAR: If they had testified, I would have made the same argument, that they had lied.

THE COURT: Maybe you would have, counsel. I guess what I'm thinking, and I'm thinking aloud, but I'm afraid the inference may have been there, that when they were confronted by the FBI it sounded like you were saying—maybe you weren't saying it, and maybe I should listen to what else was said, because it sounded like what you were saying is that when they were confronted by the FBI they chose not to say anything and now their lawyers are to say something that will—

Mr. LASSAR: No.

THE COURT: *It suggested that you're saying the lawyers are fabricating facts to argue to the jury.*

MR. LASSAR: *Well, I don't think there's anything wrong with my arguing that, but—* . . .

Trial Tr. 5715; 5718–5721 (emphasis added).

The court admonished the jury to disregard the comments regarding defense counsel and not to hold against the defendants' their decision not to testify. At the conclusion of the defendants' closing arguments, the prosecution gave its rebuttal argument. One would think that after the prior problems during his closing arguments, the prosecutor would know better than to further raise objectionable argument, but for whatever reason he went for broke, stating:

MR. LASSAR: If you want to know the intent of Mr. Andreas and Mr. Wilson, all you have to do is look at citric acid because it gives us the perfect way to look at their intent because the conspiracy in citric acid started before the lysine conspiracy and the lysine conspiracy was explicitly modeled on the citric acid conspiracy. *We heard about the citric acid conspiracy, completely unrebutted in testimony from Barry Cox, who is currently working at ADM in charge of citric acid.* Tr. 6075 (emphasis added).

MR. LASSAR: Should we have used Mark Whitacre? Well, we can—we've read the end of the book. So when we ask that question, we've read the end of the book first. *We saw the videotapes of Hawaii and Irvine and we know that the defendants are guilty.* So it's easy to go back and—

MR. HULKOWER: Objection, Your Honor.

THE COURT: Sustained. The jury is instructed to disregard that last sentence, we know. Tr. 6115 (emphasis added).

## DISCUSSION

### I. *Preservation of error*

■ Whether the court can address the substantive issues underlying the defendants' motion for mistrial depends on whether they objected to preserve their claim. The government contends that with respect to the closing argument, defense counsel failed to contemporaneously object by reserving their objections until after the prosecution concluded its argument. The court notes that the objections occurred, at most, within one minute after the argument in question was uttered. The delay in the objection, in this court's opinion, was nothing more than a tactical decision to avoid any greater attention to the statements.

The prosecution is clearly hoping that the court will follow the adage "timing is everything" and avoid the thorny issues that it created. The prosecution's defense of its argument weakly and unpersuasively contends that the defendants' objection was not contemporaneous and therefore, was untimely and that the court should therefore pack

up its bags and simply ignore what happened. Well, no such luck!

The prosecution's inflammatory comments occurred, at most, within one minute prior to the end of its argument. Upon conclusion of the argument, the defendants immediately requested a sidebar at which time they voiced their respective objections, giving the bases therefor, moved for a mistrial and alternatively requested a curative instruction. The Seventh Circuit has found that objections made close in time but otherwise delayed due to strategic considerations are to be deemed timely. *See United States v. Carter*, 720 F.2d 941, 950 n. 7 (7th Cir.1983) *quoting United States v. Trutenko*, 490 F.2d 678 (7th Cir.1973).

The government cites numerous cases which state the black letter rule that objections must be "contemporaneous" in which the federal courts have declined to address the substance of the objection. However, all such cases cited are clearly distinguishable and do not preclude the court from analyzing the substance of the remarks. *See e.g. United States v. Sepulveda*, 15 F.3d 1161, 1186 (1st Cir.1993) (defendant did not object until the end of the day long after the government had completed it closing); *United States v. Johnson*, 26 F.3d 669 (7th Cir.1994) (objection made *after* alleged error occurred is timely provided the government is afforded the opportunity to respond).

Indeed, the ·prosecution relies heavily on *Johnson*, claiming that even if the objection was timely, it was somehow deprived of the right to clarify what he meant to say to the jury. However, the defendants' objection entirely conformed to *Johnson*. They almost immediately objected, stating the basis for the objection, moving for a mistrial or alternatively demanding a curative instruction. The prosecutor had his opportunity to explain his comments. Indeed, he told the court that they were, in his opinion, proper argument, but never offered a detailed explanation supporting that opinion. Since the defendants preserved their objections in compliance with Seventh Circuit authority, the court now turns to the merits.

## II.   *The comments*

Oceans of ink have been spilled in recounting what is clearly established "horn-book law": prosecutors are strictly prohibited from implicitly or explicitly commenting on a defendant's invocation of his Fifth Amendment privilege against self-incrimination. *Griffin v. California*, 380 U.S. 609, 613–614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir.1996); *United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995); *United States v. Gant*, 17 F.3d 935 (7th Cir.1994); *Brecht v. Abrahamson*, 944 F.2d 1363 (7th Cir.1991); *United States v. Sblendorio*, 830 F.2d 1382, 1395 (7th Cir.1987). The court strongly suggests that the government attorneys refamiliarize themselves with these not-so recent developments in criminal law.

The government contends that it properly commented on the fact that Wilson declined to explain prior comments voluntarily made to the FBI during the June 29, 1995 raid. But the prosecution's argument was not narrowly confined to Andreas' and Wilson's inconsistent statements. Rather, by stating that defendants Andreas and Wilson refused to talk to the FBI and invoked their right to counsel, and then almost immediately implying that defense counsel will fabricate facts, the government implicitly argued that the jury should convict due to an inference of guilt based on their refusal to testify. This is clearly beyond the pale of permissible prosecutorial argument in light of *Griffin* because the argument was "manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant[s'] failure to testify." *United States v. Perez*, 870 F.2d 1222, 1229 (7th Cir.1989) *quoting United States ex rel. Burke v. Greer*, 756 F.2d at 1300 (citations omitted).

As the prosecution emphasized throughout its closing argument, an individual would be liable under the Sherman Act for intentionally agreeing to price-fix whether or not he committed any act in furtherance of the alleged agreement. Thus, the defendants' mental states have always been a material issue. By accusing the defendants of lying to the FBI and arguing to the jury that the alleged lies are circumstantial evidence of their intent to violate the law, the government subtly but nonetheless improperly drew

attention to the defendants' declination to testify. Only they could rebut the prosecution's argument and state why they did not speak to the FBI. Thus, by remaining silent, the invocation by the defendants of their Fifth Amendment privilege was held against them and abused to create an inference of guilt. *See e.g., United States v. Cotnam,* 88 F.3d at 497.

Here, the situation was aggravated since the prosecution immediately launched into an explicit attack of the defense counsel by claiming that they would fabricate defenses, after having the benefit of reviewing all the evidence. Obviously, unsubstantiated and baseless attack on the integrity of defense counsel is improper. *United States v. Hartmann,* 958 F.2d 774, 785–86 (7th Cir. 1992). It created the dual prejudicial effect of subtly but effectively leading the jury to believe that defense counsel was somehow violating the law to obtain an acquittal.

The prosecution claims that it did not in fact, nor did it intend to, personally attack defense counsel. The court agrees that he probably did not intend to do so. Despite the high stakes of this case, and the inherent acrimonious nature of the adversarial process, the parties displayed a commendable degree of professionalism and civility during the course of this case. However, without the opportunity to observe the parties outside the limited confines of the courtroom, the jury has no basis to take prosecutor's words for anything other than their face value and based on their context, the jury could reasonably, erroneously, construe his argument as a personal attack regardless of his intent ... just as easily as the FBI presumably construed the defendants' silence as evidence of guilt as opposed to other innocuous reasons.

Similarly, by vouching for the strength of the government's case by interjecting comparisons between other criminal cases being prosecuted across the nation, the prosecution introduced irrelevant extrinsic information, not a part of the record in the instant case, which was plainly irrelevant and inadmissible. Prosecutors are not permitted to express their personal beliefs or opinions as to the veracity of the evidence or to imply that it is stronger based on facts not in evidence. *United States v. Davis,* 15 F.3d 1393, 1394 (7th Cir.1994); *United States v. Robinson,* 8 F.3d 398, 415–16 (7th Cir.1993). The government claims it did not vouch, but instead merely made a prefatory remark as to what he believed the jury would find the evidence to support.

Yet, when the prosecutor told the jury that the evidence they had just seen was "the most compelling and powerful that has ever been presented in an American courtroom," it expressed a personal opinion of the evidence based on circumstances outside the record. His argument arguably carried the imprimatur of legitimacy by virtue of his stature as the chief federal law enforcement officer of the Northern District of Illinois. Consequently, the jury could possibly be persuaded to convict due to considerations apart from the evidence.

Of course, the prosecutor in question has his own interpretation and believes that the comments are proper argument. But he never fully explained why despite three separate opportunities to do so. He never fully explained them at side bar when the defendants objected. The next day he sent an assistant to argue this very motion, instead of explaining his actions himself. Finally, and most tellingly, the prosecution's written opposition to the mistrial motion never even directly cites the relevant portions of the trial transcript or attempts to explain the context of the statements except for broad abstract post-hoc rationalizations.

Maybe in retrospect, the prosecutor realized that he misspoke during the heat of the closing argument ... that is certainly how this court would like to construe his silence. Unfortunately, the very next day he again drew attention to Mr. Wilson's refusal to testify by arguing that Barrie Cox's testimony went "completely unrebutted," and then by concluding "we know that the defendants are guilty." Tr. 6075; 6115.

Referring to Barrie Cox's "unrebutted" testimony undeniably drew attention to Mr. Wilson's decision not to testify. Cox's testimony involved citric acid to establish that citric acid was the model for the lysine conspiracy. Wilson was the head ADM's citric acid division and the only person who

could rebut most, if not all, of Cox's testimony. In *United States v. Hastings*, 660 F.2d 301, 303, *rev'd* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the Seventh Circuit reversed the defendants' convictions, holding that the prosecutor's closing argument prejudicially commented on the defendants' failure to testify as they were the only individuals who could conceivably rebut the prosecutor's argument.

The Supreme Court reversed the Seventh Circuit after concluding that in light of the trial record, the comments constituted harmless error. *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). In light of *Hastings*, the court must first determine whether anyone other than the defendants could have responded to the prosecutor's comments and then must determine whether, considering the record as a whole, the comments were prejudicial, necessitating a mistrial. The prosecutor said what he said, and it was simply wrong.

Accordingly, the court finds that the prosecution's comments infringed upon the Fifth Amendment privilege against self-incrimination of defendants Andreas and Wilson. On the other hand, Whitacre's Fifth Amendment privilege against self-incrimination was not implicated since the comments focused solely on statements made during the FBI raid at ADM which are inapplicable to Whitacre since he was for all intents and purposes a government agent. However, the court notes that Whitacre's defense counsel did raise a valid Fifth Amendment Due Process concern based on the attacks on Whitacre's defense counsel. The court must now decide whether the situation has been adequately remedied as to all of the defendants.

### III.  *Remedy*

■ To state a viable Fifth Amendment violation, the defendants must show that the comments were: (1) a manifest intention to refer to their silence; and (2) the remark was of such a character that it naturally and necessarily be construed as a comment on the defendant's silence. *Cotnam*, 88 F.3d at 497 *citing Rodriguez v. Peters*, 63 F.3d 546, 561 (7th Cir.1995) (citations omitted). As stated above, the comments were undeniably improper and referred to the defendants' silence.

■ Due Process challenges to prosecutorial misconduct are analyzed under a slightly different standard. Whitacre must show that the statements deprived him of a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). However, the harmless error doctrine applies to both substantive challenges.

■ The Seventh Circuit applies five factors to determine whether a prosecutor's statements constitute reversible error, including: (1) the nature and seriousness of the prosecutorial misconduct; (2) whether the prosecutor's statements were invited by impermissible conduct by the defense; (3) whether the trial court instructed the jury to disregard the statements; (4) whether the defense was able to counter the improper comments through rebuttal; and (5) the weight of the evidence against the defendants. *Rodriguez v. Peters*, 63 F.3d 546, 558 (7th Cir.1995).

■ Assuming the jury convicts all or some of the defendants, the government bears the burden of proving beyond a reasonable doubt that the defendants would have been convicted absent the unconstitutional remarks. *Cotnam*, 88 F.3d at 498. After reviewing the trial record as a whole, the court finds that the comments constitute—just barely—harmless error and do not warrant a mistrial.

■ The comments were plainly improper, thus the first factor applies. Likewise, the defendants never opened the door to such an attack, hence the second factor weighs in their favor. Nonetheless, the court granted the defendant's motion for a curative instruction and strongly admonished the jury to disregard the inflammatory comments, and now firmly believes that the curative instruction coupled with the defendants' opportunity to rebut the statements during their closing cured the prejudice, if any, that resulted from the remarks.

The court's curative instruction strongly admonished the jury to completely disregard the comments regarding the defendants' refusal to talk to the FBI, and the attacks against defense counsel. The jury was reminded that, as a matter of law, the defen-

dants' invocation to remain silent and refusal to testify could not be held against them. Moreover, the court informed the jury that defense counsel never, in this court's opinion, engaged in improper conduct and that any inference to that effect created by the prosecution's comments must be completely disregarded. As a matter of law, the jury is presumed to follow curative instructions. The comments though inflammatory, were still argumentative and cured by the court's instruction. The court's unique ability to influence the jury clearly, in this court's opinion, dispelled any false impressions of the law or facts, if any, that the prosecution possibly created.

Finally, the court firmly believes that there is sufficient evidence, if the jury believes it and accepts the government's theory of the case, for the jury to convict the defendants. The jury heard well over two months of evidence, including co-conspirator testimony, audio and video tapes revealing Andreas and Wilson engaging in what arguably could be construed to be price-fixing activity. Whether it is or is not is within the province of the jury, and the court is convinced that after the curative instruction, the jury will consider nothing but the evidence adduced at trial.

Whitacre's defense counsel argued that the government produced no evidence prior to November 5, 1992—when Whitacre became a government agent—which implicates him in the alleged conspiracy. The court disagrees. The government produced evidence regarding the 1992 Mexico City Meeting which reveals that Whitacre engaged in conduct which could arguably be construed as negotiating the price-fixing scheme with co-conspirators. Whether he discussed illegal price-fixing or legitimate trade association matters is for the jury to decide. Accordingly, the motion for mistrial is denied as to all the defendants.

## CONCLUSION

For the foregoing reasons, the defendants motion for mistrial due to prosecutorial mis-

conduct is denied as to Michael D. Andreas, Mark E. Whitacre, and Terrance S. Wilson.